***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Harris with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Commission, and the Commission has jurisdiction of the parties and the subject matter herein. *Page 2 
2. On July 26, 2007, Plaintiff was an employee of Defendant-Employer and held the position of correctional officer.
3. On the date in question, Defendant-Employer was self-insured, and Key Risk Management Services was the third-party administrator for Defendant-Employer.
4. Plaintiff's claim was denied by way of a Form 61 submitted by Defendant on March 26, 2008.
5. Plaintiff's average weekly wage is $568.75, with a compensation rate of $379.19.
 *********** EXHIBITS
The following documents were accepted into evidence as stipulated exhibits:
 1. Exhibit 1: Executed Pre-Trial Agreement
 2. Exhibit 2: Industrial Commission Forms
 3. Exhibit 3: Plaintiff's discovery responses
 4. Exhibit 4: Plaintiff's medical records
Transcripts of the depositions of Amy Jacobs, Dr. Bryan Springer and Dr. Stephen Brockmeier were also received post-hearing.
 *********** ISSUES
1. Whether Plaintiff sustained a compensable injury to his right hip on July 26, 2007?
2. To what compensation, if any, is Plaintiff entitled?
 *********** *Page 3 
Based upon all of the competent credible evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. The undersigned hereby take judicial notice that Corvel Corporation succeeded to the obligations of Key Risk Management Services as of July 1, 2009 and is now the third-party administrator on this claim.
2. Plaintiff was 38 years old at the time of the hearing before the Deputy Commissioner, with a date of birth of October 5, 1971. He is a high school graduate. Before getting into prison guard work around 2004, Plaintiff had worked in a warehouse and on a vending company route, both physical jobs that involved moderate lifting.
3. In April 2006, Plaintiff was involved in a car accident unrelated to his work and broke his right hip. At that time, Plaintiff underwent emergency surgery to repair a fracture to his right femoral neck. The procedure, a percutaneous pinning of his right hip, involved the placement of three screws through Plaintiff's femur, across the fracture site, and into the ball portion of the ball-and-socket joint.
4. Plaintiff had an uneventful recovery from the April 2006 injury and surgery. After a 12-week recovery period following the surgery, Plaintiff returned to full activities and his full-duty job with Defendant-Employer. Following his return to work, Plaintiff did not have problems with his right hip until the date of injury in this claim, and he was able to perform his full work duties as a correctional officer without complaints of right hip pain.
5. As of July 26, 2007, Plaintiff was working in a full-duty capacity as a correctional officer at Defendant-Employer's Lanesboro Correctional Institution, a maximum-security *Page 4 
facility. Plaintiff's job involved contact with inmates convicted of violent crimes, and he had to become physically involved to break up altercations at least once per month.
6. On the evening of July 26, 2007, Plaintiff was at work in the Richmond unit of the prison when he was alerted to a Code 400, notifying correctional officers that they needed to respond to a prison fight in progress in the prison's Moore unit. As he was running to respond to the fight, Plaintiff slipped on a slick cement floor that was being mopped by an inmate, and his right hip slammed into the wall. Plaintiff managed to catch himself without falling to the floor and limp to the site of the fight, which had been contained by the time he arrived.
7. One of Plaintiff's fellow correctional officers, Amy Jacobs, witnessed Plaintiff's accident on July 26, 2007 and corroborated Plaintiff's account of it.
8. After the Code 400 incident, Ms. Jacobs saw Plaintiff in the yard holding and rubbing his right hip. Ms. Jacobs asked Plaintiff is he was alright, to which Plaintiff responded, "I think I messed something up." Ms. Jacobs advised Plaintiff that he should report his injury to the officer in charge, but Plaintiff responded that, if he did so, he would either be sent home or to the doctor, and he could not afford to miss work.
9. Plaintiff feared that he would lose his job if he informed Defendant-Employer that he had been hurt on duty, and he continued to work without reporting the accident.
10. Over the next couple of weeks, Plaintiff continued to do his job as best he could despite having a limp and worsening right hip pain. Plaintiff performed primarily sedentary duties, such as running the control booth, with his fellow officers taking over his more strenuous duties to help him out.
11. After July 26, 2007, Plaintiff's pain progressively worsened, to the point that, on August 16, 2007, he presented to Dr. Springer, an orthopedic surgeon, for evaluation. *Page 5 
12. Plaintiff reported to Dr. Springer that he worked as a prison guard and had recently been doing light duty work because of his right hip pain. Plaintiff presented with a pronounced limp and complained of right hip pain. Dr. Springer did not recall whether he specifically asked Plaintiff if he had sustained any trauma to his hip, and his office note does not reflect either a positive or negative report of trauma.
13. X-rays showed that the three screws in Plaintiff's right hip were broken.
14. Dr. Springer diagnosed a malunion of Plaintiff's right hip, failure of the hardware and possible avascular necrosis. He recommended that Plaintiff have a total hip replacement but did not prescribe any pain medication.
15. Later that day, still in pain, Plaintiff went to the emergency room at CMC-University Hospital to seek relief. The intake record from that visit indicates that Plaintiff reported having fallen with a twisting motion and having sustained a direct blow to his right hip approximately two weeks earlier. Plaintiff further reported that, since then, his right hip had been painful, and he was unable to bear weight.
16. At the emergency room, Plaintiff was examined by Dr. Ohl, Dr. Springer's partner, who also recommended a hip replacement. Plaintiff was prescribed Darvocet for pain and was given a note to be out of work for two days.
17. Plaintiff reported his work injury to his supervisor at the prison on August 17, 2007 and indicated that he had been told that he needed a hip replacement and could not return to work.
18. Plaintiff's last day of work was August 16, 2007. *Page 6 
19. Because of the serious nature of the procedure being recommended, Plaintiff sought a second opinion with Dr. Brockmeier, another orthopedic surgeon, who Plaintiff presented to on August 24, 2007.
20. Dr. Brockmeier diagnosed a femoral neck non-union with failed hardware, and, based on Plaintiff's age and condition, he also recommended a hip replacement. Plaintiff was comfortable with Dr. Brockmeier and his recommendation, and he underwent a hardware removal and total hip arthroplasty on September 12, 2007.
21. The surgery was successful, and Plaintiff recovered and underwent rehabilitation with no complications.
22. Plaintiff was written entirely out of work throughout the course of his treatment with Dr. Brockmeier.
23. On March 11, 2008, Dr. Brockmeier released Plaintiff to full activities and discharged him from treatment. However, Dr. Brockmeier told Plaintiff that he should not return to work as a correctional officer because the inherent danger of the job was incompatible with the instability and limitations in range of motion and strength in Plaintiff's right hip following the arthroplasty. As such, Dr. Brockmeier recommended that Plaintiff find a new occupation.
24. Dr. Brockmeier stated that Plaintiff will need follow-up X-rays every one to two years to monitor the condition of his right hip and can expect to need a new hip replacement every 10-15 years for life.
25. Drs. Springer and Brockmeier agreed that non-union of the fracture is a common complication following femoral fracture repairs such as Plaintiff underwent after the April 2006 car wreck. They also agreed that, in a non-union, the screws will typically succumb to the cumulative effects of weight-bearing and will break at some point. They also agreed that *Page 7 
Plaintiff had a non-union of his right hip fracture as a pre-existing condition before the July 26, 2007 incident.
26. Dr. Springer stated that it was unlikely that the July 26, 2007 incident, in and of itself, caused the screws in Plaintiff's right hip to break. Dr. Brockmeier stated that, while screw failure is typically a cumulative process, there is usually one event that causes the screws to fracture.
27. Dr. Springer could not say whether the July 26, 2007 incident aggravated Plaintiff's pre-existing non-union condition, but he noted that any trauma can exacerbate a condition.
28. While Dr. Brockmeier could not say what caused Plaintiff's non-union, he felt that the hardware failure was due to trauma. He opined that Plaintiff's original right hip fracture from April 2006 had not healed as of July 26, 2007, and that the failure of Plaintiff's right hip occurred on July 26, 2007 because of the non-union and the trauma of striking his right hip against the wall on that date.
29. As Dr. Brockmeier opined, Plaintiff's striking his right hip against the wall on July 26, 2007 at the very least aggravated and/or exacerbated his non-union condition and, while Plaintiff's hip was certain to fail at some unknown point, the timing of the actual failure was certainly produced by the July 26, 2007 incident. As Dr. Brockmeier further opined, given that Plaintiff was doing well physically before the incident and was in pain and unable to weight-bear after the incident, the July 26, 2007 incident was the event that pushed Plaintiff "over the edge."
30. With respect to current physical restrictions, Dr. Brockmeier stated that Plaintiff should not crouch, stoop or engage in any movement that involves hyper-flexion, abduction *Page 8 
and/or internal rotation to his right hip, as these movements would put Plaintiff at risk of instability or dislocation of his implant.
31. To any extent that the causation opinions of Drs. Springer and Brockmeier are in conflict, the undersigned accord more weight to the opinions of Dr. Brockmeier, as he is the physician who has treated Plaintiff's condition over time, while Dr. Springer saw Plaintiff only once.
32. As of date of the hearing before the Deputy Commissioner, Plaintiff was not working. He had received paperwork to begin vocational rehabilitation through the North Carolina Division of Vocational Rehabilitation Services, but he had not yet returned said paperwork. Plaintiff also had not engaged in any job search.
33. Plaintiff received short-term disability benefits under an employer-funded plan after leaving work on August 17, 2007.
34. The medical treatment Plaintiff has received has been covered by Plaintiff's personal health insurance.
35. Plaintiff pleaded guilty to misdemeanor breaking and entering in April 2007. As a result, his certification to be a law enforcement officer was revoked, and he is no longer eligible to be a correctional officer. Defendant has not contended, however, that but for the revocation, a job with Defendant-Employer comporting with Plaintiff's physical limitations and experience would be available to him.
36. Further medical treatment is reasonably required to effect a cure and/or provide relief for Plaintiff's right hip condition.
 *********** *Page 9 
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff has shown that he sustained a material aggravation of his pre-existing right hip non-union condition in the July 26, 2007 incident at work. Such aggravation is compensable. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has shown that, as a direct and natural result of the July 26, 2007 incident, he has had to undergo a right total hip replacement.
3. Plaintiff has shown that he was totally disabled, in that he was medically unable to work in any employment, from August 17, 2007 through March 11, 2008. As such, he is entitled to TTD compensation during said period. Plaintiff has not shown that he has been disabled since March 11, 2008, and he is thus not entitled to indemnity compensation beyond that date. N.C. Gen. Stat. § 97-29.
4. Defendant is entitled to a credit for the short-term disability payments Plaintiff has received. N.C. Gen. Stat. § 97-42.
5. Plaintiff has shown that there is a substantial risk of the necessity for future medical treatment related to his compensable right hip condition. As such, he is entitled to an order suspending the operation of the two-year limitations period of N.C. Gen. Stat. § 97-25.1 for ongoing medical treatment.
6. Plaintiff is entitled to have Defendant pay for the treatment he has heretofore received for his compensable right hip condition, and he is entitled to have Defendant authorize and pay for further treatment for said condition, including but not limited to diagnostic testing, *Page 10 
surgeries, prescriptions, physical therapy, pain management, referrals and mileage. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to the attorney's fee provision below, and subject to a credit for the amount Plaintiff received from an employer-funded short-term disability plan beginning on August 17, 2007, Defendant shall pay to Plaintiff, in a lump sum, back temporary total disability compensation in the amount of $379.19 per week for the period from August 17, 2007 through March 11, 2008.
2. As Plaintiff's attorney's fee, Defendant shall deduct 25 percent of the lump sum payment specified in Paragraph 1 above and pay such portion directly to Plaintiff's counsel.
3. Dr. Brockmeier is hereby designated as Plaintiff's treating physician, and Defendant shall, without application of the limitations period of N.C. Gen. Stat. § 97-25.1, authorize and pay for the treatment Dr. Brockmeier recommends for Plaintiff's compensable right hip condition, including but not limited to diagnostic testing, surgeries, prescriptions, physical therapy, pain management, referrals and mileage.
4. Defendant shall pay for the treatment that Plaintiff has heretofore received for his compensable right hip condition, including but not limited to diagnostic testing, surgery, prescriptions, physical therapy, pain management, referrals and mileage. To the extent that Plaintiff and/or any third-party payor has paid for such treatment, Defendant shall reimburse such payor(s) in full. *Page 11 
5. Defendant shall pay the costs. As part of its costs, if it has not done so already, Defendant shall pay expert witness fee to Drs. Brockmeier and Springer, the amounts of which were already set in Orders filed by Deputy Commissioner Harris on February 10, 2009 and July 6, 2009, respectively.
This the 20th day of April, 2010.
 S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ DANNY L. McDONALD COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1